[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff and the defendant, whose maiden name was Donna M. Lancaster, were married on July 1, 1978 in Ridgefield, Connecticut. The parties have lived in Connecticut since the time of the marriage and during the marriage had one minor child issue of the marriage, Kimberly Marie, born March 8, 1983.
In contrast to a multitude of contested matrimonial matters, this case was clearly a dispute between the parties over custody of their minor child. Both parties impressed the court with serious concerns and sincere desires to be the primary caretaker of Kimberly.
The seminal issue in this matter surrounds the timing of disclosure to the plaintiff of, and the extent of the defendant's diagnosed mental illness as well as its impact on the child. It is clear from the evidence presented at trial that the plaintiff's reaction to his wife's condition and the fact of that condition, was the reason this marriage has ended. It is clear that the marriage between the parties has broken down irretrievably and a decree dissolving that marriage shall issue.
The plaintiff, Jonathan Lizza is 40 years of age and received his college education at the University of Connecticut and a master's degree in secondary education at Fairfield University. He has taken, during the course of the marriage, a variety of computer courses predominately at Waterbury State Technical College. He testified during his direct testimony that he enjoyed his work and while he found it rewarding, continued his education because he feared he had plateaued. The plaintiff is the sole adopted child of his parents who attended all the court proceedings. The parties dated for approximately two years prior to their marriage in 1978. The defendant testified that at some point during their engagement, she disclosed to him that she had been hospitalized due to a mental condition. The plaintiff testified on direct that the description of the problem was minimized, if indicated at all, prior to the marriage. This seemed to be an extremely sore point between the parties. It fueled the plaintiff's resentment and certainly caused the defendant much heartache and fear of rejection by the plaintiff. CT Page 1340
Shortly after the marriage, the plaintiff was arrested for indecent exposure and received a period of probation pursuant to a motion for accelerated rehabilitation which required him to involve himself in therapy. It was the only therapeutic relationship that the plaintiff had and was only undertaken because of the criminal case.
The defendant's parents were aware of the arrest. The defendant was supportive of the plaintiff during the proceedings and through the probationary period. She supported the plaintiff's decision not to tell his parents about what had occurred to him. The plaintiff testified that the first five years of marriage were happy. They vacationed together and had no major problems. However, approximately one week after Kim's birth at New Milford Hospital, the defendant had a breakdown requiring further hospitalization. She and the baby were discharged from the hospital and at home for one day when her parents called him at work. Her parents brought her to the hospital. The incident was characterized as violent by the plaintiff. He testified that he had never seen her like that before and appeared to be stunned when, during her hospitalization for the three week period at that time, he was told that she was suffering and had been suffering from bipolar disorder. He indicated that the diagnosis had never been disclosed to him and that when she had tearfully told him of a mental breakdown, he had no idea of the severity of her condition. His claim during testimony was borne out by the medical records reviewed by this court which were Exhibits 8, 9, 10, 11 and 12. The change in her personality when she decompensated was marked. The plaintiff was rather rigid and unaccepting of her condition. His rigidity and intolerance created several serious problems in the marriage.
The plaintiff testified as did the defendant to an incident during the plaintiff's treatment after his arrest for indecent exposure. The defendant disclosed that when she was a teenager her father had made a sexual advance to her which was rebuffed by the defendant and never occurred again. She had not confided in the plaintiff earlier but revealed that to the plaintiff as part of her past in the hopes that it would open some kind of avenue for him to deal with his arrest for indecent exposure. The plaintiff's reaction to that was to deny the defendant any meaningful relationship with her family. The severity and extent of that denial has created a great deal of stress for the defendant, exacerbating her mental condition especially at holiday periods and more importantly has been a great source of strain on the minor child.
After the defendant's hospitalization after Kimberly's birth she was again hospitalized in 1988 and twice in 1989; the holiday period seemed to be part and parcel of the decompensation. The defendant continues her counseling on a weekly basis and has been compliant with her medication. Her lithium dosage now at 1500 mg per day is monitored by monthly blood tests. CT Page 1341
The Court finds that while defendant was non-compliant at earlier times, she has matured in her understanding of her condition and is fully compliant with treatment at this time.
Her treatment course was hindered by the plaintiff's rejection of therapeutic intervention and by his complete rejection of defendant's family. The court was appalled by his testimony concerning the defendant's brother, with whom he testified he enjoyed a close relationship during the early stages of the marriage. He stated during testimony that he had helped his brother-in-law, but "never got anything back." His severance of that relationship coincided with his break from her parents.
The defendant is 34 years of age and in addition to her mental health history has some issues relating to high blood pressure which is monitored periodically and for which she takes Vasotec. There had been no hospitalizations for her medical issues. The defendant graduated from Ridgefield High School even though she was first hospitalized at Danbury Hospital during her senior year from which she was transferred to Fairfield Hills Hospital for two and a half days and then to Hallbrook Hospital. That was in May of 1974. Thereafter in April of 1976, she was non-compliant with medication and tried to work her way off medication causing another three to four week period of hospitalization. Shortly thereafter, she started seeing Mr. Lizza. During the time of their courtship and prior to Kimberly's birth, she was employed at Richardson Vicks in employee assistance, essentially processing medical claims for personnel. The defendant attended Western Connecticut State University for a brief period of time prior to her pregnancy. From the time of her hospitalization in 1976 she was compliant with her medication. She was not taking lithium for the period during the pregnancy with Kimberly based on the teratogenic nature of the medication. When Kimberly was just over one year of age, the defendant resumed part-time employment at Bradlee's, as an aerobic instructor, and took spare housekeeping jobs while Kimberly was in nursery school. In the beginning of 1989, the defendant began employment at Ruth Chase Flowers in New Milford which was part-time, twenty-four to twenty-five hours.
At the time of trial, the defendant had applied for full time employment and expected to have to work full time to support the child.
Mrs. Lizza testified that after the marriage she and her parents were supportive of Mr. Lizza after his arrest and that they maintained a cordial relationship with her family as well as his family. There were items of Mr. Lizza's life that were kept secret from his parents such as his arrest, his interest in motorcycles and the fact that he lost his teaching job and was employed selling cars for a time prior to his more steady employment at MCI in Norwalk.
The apparent change in interfamily relationships within the term of this marriage was testified to as well by the defendant and will be CT Page 1342 dealt with by the court in its discussion of the issue of custody insofar as those inter relationships affect the court's findings on the issue of custody.
 III
Custody.
As indicated earlier in this opinion, this court has regarded this case to be a unique case focusing on issues of custody over one minor child issue of this marriage, Kimberly.
Kimberly was presented to the court in photographs and in descriptions by both of her parents as well as her grandparents who testified in this matter. Of striking irony to this court was a photograph of the child at the Cape Cod National Seashore, Plaintiff's Exhibit #5, which quotes Henry David Thoreau; "The seashore is a sort of neutral ground, a most advantageous point from which to contemplate this world." Unless there is more understanding coupled with serious counseling by this disfunctional extended family, this child will never see neutral ground, nor will she ever have an advantageous place where she can prepare for a mature life.
In her testimony concerning the minor child, the child's therapist, Barbara Duffy, whose testimony was specific and lengthy with respect to her therapeutic relationship with the child, and which covered twenty three single-spaced pages of trial notes by the court, indicated that Kimberly was especially close to her maternal grandmother and paternal grandfather. What was striking to the court is that, in her own way, Kimberly has been able to weed through the morass of difficulties in her extended family to find a place where she felt comfortable, with grandparents from each side of her warring clans.
The tragic circumstance of this case was the visible and palpable tension in the courtroom between the paternal and maternal grandparents which was articulated in therapy by Kim and more importantly felt so deeply by her.
In terms of this court's great obligation to Kimberly, this court can only attempt to give guidance to a family and to impress upon that extended family how important their participation in Kimberly's long term health and happiness are tied into her ability to have the freedom to love whomever she chooses in her family to whatever extent she chooses.
The court in assessing Kimberly's needs in a custodial setting must focus on the style of the child and the style of the parents. The court has a great interest in helping to provide Kimberly with an atmosphere which will allow her to foster resiliancy to change, so that she can recover from stressors in her life. In these terms, the court must assess the expert evidence with respect to which parent will foster CT Page 1343 an ability within the child to transition well and to acknowledge age appropriate transition expectations.
In assessing the needs of this child, the court must make observations and decisions with respect to who can most ably promote the health and growth of the child as the child develops, from childhood through adolescence, hopefully becoming a mature adult who escapes the disfunction of her family. The court will review issues of which parent can adapt and change along with the developing needs of the child; which parent will nurture and be empathetic; which parent can allow the child's unique style to develop; instill impulse control in the child; and allow the child to understand what her reality is as well as her identity.
The evidence suggests that both parties have distinct styles and strengths to bring to this child's development. The court hopes that they can more easily acknowledge those strengths in each other to foster a positive relationship with the other parent.
From the evidence, it is clear that the defendant has been far less invasive in the child's relationship with father and paternal grandparents. The plaintiff father has spoken negatively about mother and her condition, as well as making negative comments with respect to financial issues concerning this divorce.
The defendant mother has a distinct nurturing and empathetic nature. The report by Dr. Colon deals at length with this aspect of her personality. The plaintiff father, while loving, approaches his relationship with the child more matter-of-factly.
The independence of this child is of paramount importance. The plaintiff as well as his parents demonstrate a family history of control. The fact that the plaintiff had to keep secrets from his parents who might otherwise have been unaccepting of him, is not behavior that needs to be continued into another generation.
Her ability to be independent does depend upon a parents ability not to unconsciously transmit fear or apprehension into the child. That need is especially great here, where a child is asked to deal with bipolar disorder, in mother, and father's unresolved conflict about it. The defendant's motives in so doing are not suspect by the court. He is acting out of a desire to protect his child. However, that works against having a child who is educated and understanding of her reality — both that her mother has this condition and that she is genetically at risk for the same condition.
There is ample evidence that the defendant mother has been receptive to education concerning, and treatment for, her condition. Her positive feelings about therapeutic intervention are critical for Kimberly's assimilation of this fact of her life into her reality. The level of denial by plaintiff father has not been in the best interests of the child. CT Page 1344
There was some testimony during trial with respect to the plaintiff's exhibition of anger. The psychological report of Dr. Colon also refers to the plaintiff's temper. While the defendant had physically disciplined Kimberly, her style is quieter, while the plaintiff's is more aggressive. The plaintiff's impulse control is based upon external pressures to conform. The defendant appears to be motivated by internalized decisions and beliefs about behavior. Both are able to effectively discipline Kimberly to foster her learning self control.
Kimberly's identity seems to have been well-formed during the first six years of her life. A description of her as happy and fun loving, but serious at school, is coupled by Ms. Barbara Duffy's assessment that "she's fair." She appears to the court to be a child reaching out to experience all of life she can take in. Both of her parents are proud of her, and relish her love of life.
In assessing the styles of both parents, it is clear that the plaintiff is the more active and sports-minded parent, while defendant holds and nurtures and brings quiet routine to everyday life for her.
The strengths of these parents' style compliment one another vividly. If their competition for primacy would cease, Kimberly could have the best of both worlds. In terms of this matter there has been an issue made of the child's expression of a preference for which parent she would like to live with. At the time of her expression she was seven years old. While the court certainly will look to expressions of preference, they may not be dispositive at the age of seven. Moreover, there was evidence from both sides that the child had expressed differing preferences. There was expert opinion that her preference had been manipulated and in the end that she wanted nothing more to do with being asked her preference. She loves both of her parents and wants to be allowed to love them.
At first blush, the court must remark that until the defendant's breakdown in 1989, Kimberly had been raised primarily by her mother. This family structure took on an idealized "Ozzie and Harriet" look, where Dad was out in the workforce and Mom was at home during Kimberly's non-school hours and worked part-time in addition to her duties in the home. The times when Mrs. Lizza was in the hospital, child care was supplemented by grandparents or other family members and Mr. Lizza did not become a primary caretaker until legal proceedings were commenced while Mrs. Lizza was hospitalized in 1989 which proceedings eliminated her from the marital home. Insofar as these parents made decisions for their child during times of defendant's distress, those decisions were always that once she was again on an even keel, she resumed her customary position as primary caretaker of this child.
Assessment of the parties and the issue of custody were made by psychologists, Veronica Horton, M.S.W., the family services officer who wrote the custody study in this case and the therapist for the child. CT Page 1345 The uniform professional opinion is that the mother is the more appropriate custodial parent. The court agrees.
The concerns expressed with respect to mother being the custodial parent raised by Dr. Colon, plaintiff's exhibit #22 and in testimony by Ms. Duffy, was the risk of Kimberly's observing serious decompensation again in terms of her mother's condition. However, witnesses indicated that Mrs. Lizza was aware of her condition, aware of prodromal symptoms, and was able to seek out the help of mental health professionals when she recognized those symptoms which are part and parcel of her condition. Coupling that with her ability to nurture, they felt that that risk was not persuasive enough to award father custody.
Dr. Colon, who recognized father's rather painstaking care of Kimberly during the pendente lite period, expressed concern as did Mr. Duffy, that father lacked understanding and acceptance of the defendant's bipolar diagnosis and the course of that condition. Barbara Duffy testified that his unresolved feelings with respect to that condition might come out because of father's negative statements concerning mother and about her condition which had been articulated by Kimberly. Ms. Duffy added that rejection of people with illnesses, particularly chronic illnesses, were counter-productive to the idealization of family and also the need to support each other, particularly in crisis. That was of some concern to the court based on testimony that the bipolar disorder is regarded in many circles as a dominant genetic factor and that Kimberly is as risk for symptomotology of that disorder. Kimberly's understanding of the disorder is critical to her well being as she reaches her adolescence which will be a critical times for her as to whether or not she is ever symptomatic for the disorder.
It was generally regarded by the mental health experts who testified in this matter that Mrs. Lizza, based on her own education and understanding of her disorder, would be much better equipped to lead Kimberly into that same kind of understanding of the disorder and put it in proper perspective. Dr. Colon especially noted that Mrs. Lizza was very able to conduct herself on a daily basis despite the disorder. She had long term employment, had been educated and there was a significant ability to recognize and deal positively with the disorder. Moreover, she had made it through a most stressful life experience — divorce — without decompensating.
Barbara Duffy also testified that Mr. Lizza had unnecessarily placed Kimberly in fear of a flare up of her mother's disorder and it added to stress in the family environment.
All mental health experts who wrote reports or who testified in this case, saw as a critical need and problem for Kimberly, the amount of time that she was expected to lead a double life because of the breakdown in any relationship between her grandparents. She was not allowed to be relaxed in her mother or father's home and was always guarded in the information that she shared, especially with her father, with respect CT Page 1346 to activities pursued with the opposite side of the family. The crux of that issue is that it will inevitably lead to a child to be schooled in manipulative behavior as a result of pressure by the parents.
Both Barbara Duffy and Veronica Horton recommend counselling. In fact Ms. Horton recommends counselling for the entire family to deal with these issues on behalf of Kimberly. Mr. Lizza, during his examination, admitted that he was opposed to any kind of counselling prior to the trial of this matter, but that he agreed at this point that he would undergo that following the trial.
Ms. Duffy testified that it was critical to Kim's understanding about decision-making and how her parents were going to see to it that they could work together to allow her to make age appropriate decisions, that they would need to go through this counselling process. Ms. Duffy felt that Mr. Lizza had not totally explored that issue of counselling because he thought he was capable of working through co-parenting issues such as discipline. Ms. Duffy indicated during her testimony that most people are not prepared to be husband and wife and parents and that viewing the counselling as an educational experience to enhance Kimberly's growth process would be beneficial for all parties.
The issue of joint custody was briefly explored. Based on the unresolved issues between the parties, it appeared to all mental health professionals that that was inappropriate at this time. While the issue of nominal custody is of no consequence to Kimberly and while the issue of who is awarded custody is only an adult issue, these people will continue to be the parents of this child and will continue to offer great strength to her. The court would hope that it would be possible at some future date for these parties, through the counselling process, to resolve their relationship sufficient so that Mr. Lizza's great interest in being an acknowledged and full joint custodial parent could be realized.
Based on the foregoing discussion, the custody of Kimberly will be with the defendant mother, with reasonable, liberal and flexible rights of visitation in the plaintiff father. That visitation shall include, but is not limited to, alternate weekends from Friday at an appropriate hour, depending on father's schedule, to Sunday at 6:00 p. m. or Monday at 6:00 p. m. if the alternating weekend falls on a legal holiday; Wednesday evenings from 5:00 p. m. to 7:00 p. m. for dinner; alternating holidays, vacation weeks and a period of not less than two weeks during summer vacation.
At all times the parties are to keep each other reasonably informed of the whereabouts of the child and they shall notify the other of illness or accident or other circumstances affecting the health or welfare of Kimberly. The parties shall confer with respect to any health related elective procedure or surgery and as much as possible confer about these issues prior to the making of appointments. Each of CT Page 1347 the parties will furnish to the other copies of any reports from third parties or institutions concerning the health, education or welfare of Kimberly.
The parties shall make every reasonable effort to maintain free access and unhampered contact between the child and the other parent and to foster a feeling of affection between Kimberly and her parents. Neither party shall do anything which would estrange Kimberly from the other or injure the opinion of Kimberly as to her mother or father or act in anyway as to hamper the free and natural development of Kimberly's love and respect for her mother or father.
The parties shall have reasonable access to Kimberly while she is with the other, including free access by mail and telephone during reasonable hours of the day and evening.
The parties are ordered by this court to undertake immediate counselling by a mutually agreed upon psychiatrist or psychologist. Failing agreement by the parties, on that selection, a psychiatrist or psychologist will be appointed by this court in order to assist them in learning to communicate with Kimberly. Counselling shall continue until it is recommended by the treating therapist that it should cease. Any reimbursed cost of the treatment shall be borne equally by the parties.
While this court may not be empowered to direct the grandparents of Kimberly Lizza to involve themselves in this therapeutic process, based on a lack of jurisdiction over the grandparents, the court strongly suggests that the conduct of the grandparents has been so disruptive to Kimberly that they should participate in this process out of their deep love for her.
 IV
During the course of the marriage, the parties purchased a home in New Milford and there was testimony concerning funds advanced by the plaintiff's parents.
The court finds that those funds advanced were in fact gifts. The plaintiff's father testified that while he considered them loans he would never seek to collect those funds. He and his wife had in fact given many rather expensive gifts to the children and they hoped to provide for their only child a comfortable home, a home in which his wife could be unemployed and stay at home and care for their one grandchild. Of significance to the court was the decision by the plaintiff, supported by his parents, for him to leave all employment during the pendency of this action and to be supported again by his parents while he took some masters courses, but essentially remained home with the child. Not only did it reduce his earning capacity at the time of trial, but the court feels it sent a provocative message of control to this child, as well as a burden of choosing one parent over the other. The court feels that the CT Page 1348 decision to stop his employment during these proceedings for the reasons stated was entirely inappropriate and not in the best interests of this child.
Apart from the marital home, the plaintiff discloses on his financial affidavit certain profit sharing and savings from his employment at MBI, as well as an IRA, totalling approximately $16,000 in value.
The defendant discloses no other significant assets save her interest in the marital home. Based on her generally part-time employment during the course of the marriage when she was the primary caretaker of the child, she has no profit sharing plan, pension or other interest in property.
With respect to the financial issues, it is apparent from the record that predictably, the plaintiff husband has the ability to acquire assets, is the only child of supportive parents and maintains a significant degree of employability despite his decision during the confines of this proceeding not to be gainfully employed.
The defendant, based on her mental health condition and education, demonstrates a diminished capacity to acquire further assets and will obviously not be employed at the same level as the plaintiff. Prior to the birth of Kimberly, she was well employed in a quasi administrative clerical role with a corporation that presumably granted benefits. At this stage of her life her employability remains a question mark for a period of time and will be considered during the financial awards made by the court.
 V
Orders
Marital Property:
A. The jointly held real estate at 267 Aspectuck Road, New Milford, Connecticut shall be placed on the market for sale and the net proceeds shall be divided equally between the plaintiff and the defendant. The plaintiff may elect to purchase the defendant's one-half share. That amount shall be ascertained by the parties selecting an independent appraiser, deducting the first mortgage, and determining one-half of that net equity. Until the time of sale or purchase of defendant's interest, the parties shall remain co-tenants of the property. The plaintiff may have sole and exclusive possession of the property but shall be responsible for all costs in maintaining the property.
B. The IRA account shall be transferred to the defendant from the plaintiff pursuant to the provisions of a qualified domestic relations order prepared by defendant's counsel. CT Page 1349
Life Insurance:
The plaintiff shall maintain life insurance coverage on his life in the face amount of fifty thousand ($50,000) dollars naming the minor child as the beneficiary of said insurance until the time that she attains the age of eighteen (18) years or is otherwise emancipated.
Alimony:
The plaintiff shall pay to the defendant the sum of one hundred ($100.00) dollars per week in alimony for a period of five years. This rehabilitative alimony is non-modifiable as to term or amount.
Medical Insurance:
The plaintiff shall continue to provide medical insurance for the benefit of the minor child until such time as she attains the age of eighteen (18) years or is emancipated. The plaintiff shall be responsible for seventy five percent (75%) of unreimbursed health care costs and the defendant shall be responsible for twenty five percent (25%) of those costs. The plaintiff shall continue to maintain COBRA medical insurance for the defendant and shall cooperate to insure that she shall be able to continue that coverage for herself from the date of this judgment for the statutory period.
Child Support:
The plaintiff shall pay to the defendant as child support the sum of one hundred ($100.00) dollars per week and shall inform his counsel of his re-employment. The court's finding of that sum for child support is predicated upon his not working but being supported by his parents during his period of education and will be modified when he is re-employed. When the child support is modified, it is to be in accord with the uniform support guidelines in effect at the time of the modification.
Personal Property:
The personal property located in the marital home shall be divided between the parties with the assistance of a mediator to be selected and paid for by the parties.
With respect to the disposition of personal property, the property in the child's room or otherwise belonging to the child shall be utilized in whichever of her parent's homes she elects to bring those items.
Attorney's Fees.
The parties shall be responsible for their own attorney's fees. The defendant is to pay forty percent (40%) of the cost of the attorney's fees for the minor child and the plaintiff shall pay sixty percent (60%) CT Page 1350 of those attorney's fees.
Judgment shall enter in accordance with the foregoing.
DRANGINIS, J. CT Page 1351
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1352
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1353
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1354
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1355